IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

SPRT, LLC, and LIVESPORTS VIDEO, LLC,

       Plaintiffs,

                             Civ. Action No.
                             5:10-CV-0809 (FJS/DEP)

     v.

B2 NETWORKS, INC., a/k/a B2
TECHNOLOGIES, INC.,

       Defendant.

_____

APPEARANCES:                 OF COUNSEL:

FOR PLAINTIFFS:

HARRIS, BEACH, LLC           JAMES R. MULDOON, ESQ.
One Park Place, Fourth Floor     TED H. WILLIAMS, ESQ.
200 South State Street
Syracuse, NY 13202

FOR DEFENDANT:

CHRISTIANSEN, BULLOCK LLC   JIM E. BULLOCK, ESQ.
Two Galleria Tower Center
13455 Noel Road - Suite 1000
Dallas, TX 75240

HISCOCK & BARCLAY, LLC      JOHN D. COOK, ESQ.
One Park Place
300 South State Street
Syracuse, NY 13202-2078

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiffs SPRT, LLC and LiveSportsVideo, LLC (collectively,
"LiveSports"), an assignee and a licensee, respectively, have commenced
this action against defendant B2 Networks, Inc. ("B2"), alleging
infringement of a patent teaching a system to permit access by viewers to
minor sporting events not typically available through conventional
channels.  B2 has denied infringement and counterclaimed seeking a
declaratory judgment of non-infringement and patent invalidity.

At the direction of the court the parties have conferred and were
able to agree on the construction of a majority of the terms contained
within the patent claims at issue.  Despite those efforts, however, a small
number of claim terms remain in dispute, and the parties have requested
the court's assistance in construing those terms.  The matter has been
referred to me by Senior District Judge Frederick J. Scullin, Jr. for the
issuance of a report and recommendation regarding construction of those
disputed terms.  The following constitutes my reported findings and
recommendations, which are based upon submissions by the parties as
well as a claim construction hearing conducted on June 29, 2011.

I.      BACKGROUND

At issue in this case is United States Patent No. 7,340,765 (the

"'765 Patent"), issued by the United States Patent and Trademark Office

("PTO") on March 4, 2008, describing a business model for promoting

viewer access to minor sporting events.[1]  The '765 patent, which lists

Robert H. Feldmeier as the inventor, is entitled "Archiving and Viewing

Sports Events Via Internet", and discloses an internet-based clearing

house designed to provide access to end-users of video and audio

recordings or live broadcasts of sporting events, produced by the

institutions involved, and sent to a central repository for organization and

re-transmission to end-viewers.  The patent targets particular sporting

events that typically generate insufficient interest to warrant professional

productions and broadcasting, including through conventional television

channels.  The business model described permits originating institutions

to capture sporting events, utilizing their own equipment and resources,

and to forward them to a clearing house where they are sorted, indexed,

catalogued, and made available to subscribers.

---

[1]      The '765 patent is annexed to plaintiffs' complaint (Dkt. No. 1) as Exhibit A.

II.    DISCUSSION

A.    Claim Terms in Dispute

Claim one, the only independent claim of the '765 patent, serves as

a useful backdrop for analysis of the parties' claim construction dispute.

That claim provides as follows:

1.   A self-help process of producing, storing, cataloging, and
on-demand web casting of a multitude of minor-sport
athletic events, each of which has a limited viewership but
which in aggregate result in a significant volume of
viewers, by self-help video production of a wide variety of
minor-sport athletic events of interest to a wide number of
groups of interested persons at each of a plurality of
originating academic institutions, and of recording or
storing, and processing and transmitting on demand the
video recorded events to as wide as possible a field of
subscribers, the athletic events being produced by
respective ones of said originating academic institutions,
and each event being categorized in an identifiable
category of athletic events, wherein such minor-sport
events are characterized by having an associated group of
interested persons that is too small to support the cost
producing a television broadcast of the event, and whereby
each said originating academic institution needs only send
in the recorded video production to a central clearing
house and needs to take no further steps to make the
video recordings ready for subscribers for access over a
global computer network, the processing comprising:

obtaining a video production of each of said minor-sport
athletic events, by self-help, in-house capturing
the event at said originating academic institution
using at least one video camera and at least
one microphone, such that the video production

4

each include at least one video channel and an
audio channel;

said originating academic institution transmitting said video
productions to the central digital clearing house,
the clearing house having a computer processor
for digitally processing each said video
production to prepare the video channel and
audio channel thereof for digitally processing
each said video production to prepare the video
channel and audio channel thereof for digital
storage and retransmission, a digital memory
arrangement with capacity sufficient for storing
a multiplicity of said video productions of said
minor-spot athletic events to said subscribers
on demand;

converting at said clearing house said video and audio
channels of said video productions to a digital
format suitable for webcasting, and storing
same at storage locations on the associated
digital memory arrangement;

the step of converting including editing the content of said video
production at said clearing house without
involving the originating institution to render it
suitable for digital storage and transmission to a
subscriber;

said clearing house creating a subscriber accessible catalog
of the video productions stored in the memory
arrangement at said clearing house, the catalog
having categories including originating
institution and the category of type of sporting
event, and then selecting one of the category of
type of sporting events of said type and of said
originating institution;

> said clearing house providing to said wide field of
> > subscribers digital access, via said global
> > computer network, to the video recordings of
> > the events as stored on the memory
> > arrangement at said clearing house, including
> > providing each said subscriber access via said
> > global computer network to said catalog,
> > permitting the subscriber to select from the
> > categories of originating institution and type of
> > event of said catalog, and permitting the
> > subscriber to select a desired video production
> > by pointing and selecting from the video
> > productions within said categories; and
>
> said clearing house transmitting to said subscriber the
> > selected video production over said global
> > computer network.

'765 Patent 10:38-11:44.

After having met and conferred, the parties are in disagreement over the intended meanings of the terms "minor-sport"; "self-help"; "originating academic institution"; "clearing house"; "send[ing]"; "submit[ting]"; "transmit[ting]"/"transmission"; and "video events".

### B.  Claim Construction: Legal Framework

Patent claim construction represents an issue of law to be decided by the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995); *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999) (citing *Markman*).  When engaged in patent

6

construction, a court must define claim terms as one of ordinary skill in the relevant art would understand and interpret them in the context of the entire patent, including the specification. *Markman,* 52 F.3d at 986; *see also Netcraft Corp. v. eBay, Inc.,* 549 F.3d 1394, 1396-97 (Fed. Cir. 2008); *K-2 Corp. v. Salomon S.A.*,191 F.3d 1356, 1365 (Fed. Cir. 1999).

      1.  <u>General Claim Construction Principles</u>

Perhaps the most comprehensive discourse to date regarding the claim construction calculus is found in the Federal Circuit's *en banc* decision in *Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005), *cert. denied*, 546 U.S. 1170, 126 S. Ct. 1332 (2006).  In *Phillips,* though with extensive illuminating discussion regarding the relative importance of intrinsic and extrinsic evidence, the Federal Circuit in essence endorsed its earlier decision in *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576 (Fed. Cir. 1996), previously regarded by the courts and patent practitioners as defining the contours of the claim construction inquiry*. Phillips,* 415 F.3d at 1324.

The principal teaching of *Phillips* – and not a significant departure from earlier claim construction jurisprudence – is that the claims of a patent define the scope of protection afforded to the inventor.  *Phillips,*

415 F.3d at 1312.  It therefore follows that the language of a claim itself generally provides the most definitive source of enlightenment concerning the intended meaning of disputed terms.  *Vitronics,* 90 F.3d at 1582. Words contained within a patent normally should be given their ordinary and customary meaning, considered from the perspective of a person of ordinary skill in the art in question at the time of the invention – that is, the effective filing date of the patent application.  *Phillips,* 415 F.3d at 1313 (citing, *inter alia*, *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1116 (Fed. Cir. 2004)).

While it is true that the words of a patent claim will generally control, they should not be interpreted in isolation, in disregard of other portions of the patent; instead "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Phillips,* 415 F.3d at 1313.  In this regard, a patent specification, which some liken to an internal dictionary, must be carefully reviewed to determine whether, for example, the inventor has used a particular term in a manner inconsistent with its ordinary meaning. *Id.* at 1313-14; *see also Vitronics,* 90 F.3d at 1582 (citing *Markman*, 52

F.3d at 979).

A patent's specification often constitutes the "single best guide to the meaning of a disputed term." *Vitronics,* 90 F.3d at 1582.  When resorting to a patent's specification for guidance with respect to disputed claim terms one must consider it as a whole, and all portions should be read in a manner that renders the patent internally consistent.  *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1379-80 (Fed. Cir. 2001).  "[W]hile it is true that claims are to be interpreted *in light of* the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims[.]"  *Sjolund v. Musland,* 847 F.2d 1573, 1581 (Fed. Cir. 1988) (emphasis in original). "Nor should particular embodiments in the specification be read into the claims; the general rule is that the claims of a patent are not limited to the preferred embodiment."  *Cornell Univ. v. Hewlett-Packard Co.,* 313 F. Supp. 2d 114, 126 (N.D.N.Y. 2004) (Mordue, C.J.) (citing, *inter alia*, *Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1204 (Fed. Cir. 2002)) (other citation omitted).

In addition to the claim terms themselves and the patent's specification, a third category of relevant intrinsic evidence worthy of

consideration is the history surrounding prosecution of the patent.  That history, which is customarily, though not always, offered to assist a court in fulfilling its claim construction responsibilities, is generally comprised of the record of proceedings before the PTO including, significantly, any express representations made by the applicant regarding the intended scope of the claims being made and an examination of the prior art. *Vitronics*, 90 F.3d at 1582-83.  Such evidence, which typically chronicles the dialogue between the inventor and the PTO leading up to the issuance of a patent and thus can act as a reliable indicator of any limitations or concessions on the part of the applicant, oftentimes proves highly instructive on the issue of claim construction.  *Philips*, 415 F.3d at 1313 ("We cannot look at the ordinary meaning of the term . . . in a vacuum. Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history.") (quoting *Medrad, Inc. v. MRI Devices Corp.,* 401 F.3d 1313, 1319 (Fed. Cir. 2005)).

If analysis of the available intrinsic evidence resolves a perceived ambiguity in a disputed claim term, then the inquiry is ended.  *Vitronics*, 90 F.3d at 1583.  Where, on the other hand, uncertainty remains with respect to a claim after consideration of all intrinsic evidence, the court may then

turn to examination of such available extrinsic sources as expert testimony, inventor testimony, dictionaries, and technical treatises and articles for guidance in reconciling any conflicting intrinsic indicators.  *Id.* at 1584.  It should be noted, however, that extrinsic evidence may only be used to aid the court in understanding patent claims and cannot be relied upon to justify any departure from or contradiction of the actual claim language employed by the applicant.  *Id.*  To assist in resolving an ambiguity, in its discretion, a court may admit and rely on prior art, whether or not it is cited in the specification or file history.  *Id.* at 1584-85.  Prior art and dictionaries, as publicly accessible objective information, for obvious reasons, are preferable to expert testimony as tools for resolving ambiguity.  *Id.* at 1585; *see also Texas Digital Sys.*, 308 F.3d at 1202-03.

Ultimately, interpretation of the terms of a patent claim can only be determined with a full understanding of what the inventor actually invented and intended to encompass within the scope of his or her patent claims. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998).  For this reason, when inventors distinguish their invention from prior art, that prior art is properly excluded from coverage of the patent's claims.  *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 267 F.

Supp. 2d 533, 543 (N.D. W. Va. 2003) (citing *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.,* 242 F.3d 1337, 1343 (Fed. Cir. 2001)).

## 2.   Person of Ordinary Skill in the Art

Before turning to the task of claim construction, the court must first determine the relevant prism through which the patent in suit should be viewed.  The court's assigned task when addressing claim construction is to ascertain how a person of ordinary skill in the art would have understood the disputed claim terms at the time of the invention. *Markman,* 52 F.3d at 986.  Accordingly, patent claims must be interpreted not through the eyes of the court, nor those of any proffered experts, but rather from the standpoint of a person skilled in the relevant art. *Interactive Gift Express, Inc. v. Compuserve Inc.,* 256 F.3d 1323, 1332 (Fed. Cir. 2001).  In fashioning the hypothetical construct of that person of ordinary skill in the art, a court should consider the educational level of the inventor, the type of issues encountered in the art, the prior art solutions to problems experienced, the rapidity with which innovations are made in the subject area, the sophistication of the technology involved, and the educational level of workers in the field.  *Helifix Ltd. v. Blok-Lok, Ltd.,* 208

F.3d 1339, 1347 (Fed. Cir. 2000) (citation omitted).

The parties appear to be in agreement concerning the definition of a person of ordinary skill in the art.  Having considered their submissions and found the position espoused by both to be reasonable, I recommend that a person of ordinary skill in the art in this instance be defined as "having at least an associates degree in engineering, or comparable training, and familiarity with internet broadcasting capabilities, as well as an understanding of, or experience in, producing and broadcasting sports events for academic institutions."

C.  Construction of Disputed Terms

1.  Minor-Sport

The first controverted term is "minor sport."  Considerable guidance is provided by the inventor regarding this disputed claim term, both throughout the patent's specification and in responses to office actions on the part of examiners within the PTO.  The patent itself makes clear that the term is contextual – that is, it does not readily admit of placing particular sports in the category of major or minor, regardless of popularity and viewership.  In the background section of the patent the inventor notes the following:

> At the present time, video productions of college
> athletics are limited to major sports only, e.g., football
> and men's basketball, and then only for a selected
> ones [sic] of major universities.  Because of the high
> cost associated with producing a sports event for
> national broadcast, there is little interest in producing
> video broadcasts for small colleges or for so-called
> minor-sports such as track, wrestling, swimming and
> diving, tennis or soccer, other than when the game or
> meet involves a championship.  Because of this small
> market involved with these minors sports and with
> small colleges, it is difficult for a major network to sell
> advertising time at prices that would support the costs
> of production.   For that reason, it is difficult for an
> alumnus or other person interested in a particular
> college to view that institution's games and meets,
> unless he or she happens to be in the local area on the
> day of the contest.

'765 Patent 1:35-50.  Elsewhere in the patent, including within the

preamble to claim one, the inventor characterizes minor-sporting events

as "having an associated group of interested persons that is too small to

support costs producing [sic] a television broadcast of the event, . . .."

'765 Patent 10:51-54.

LiveSports proposes that the term "minor-sport" be construed as

"any sporting or athletic game, meet, match or other competition, or

portion thereof, whose average potential viewership is below that which

would justify conventional television coverage, either live or tape-delayed,

by local, national or other media organizations."  While earlier advocating

14

for a far different construction, defendant B2 now urges that the term be construed as "non-revenue producing sporting events at originating academic institutions."[2]  When pressed during oral argument concerning the issue of revenue, defendant further sharpened its proposed definition to include only non-*net* revenue producing sports events at such originating academic institutions.

During the prosecution leading to the issuance of the '765 patent, the inventor was asked by a PTO examiner to refine his definition of "minor-sports event", and responded as follows:

> A definition of "minor-sports event" can be found in the specification, e.g., at the paragraph bridging pages 1 and 2. Minor-sports are those which typically do not have a large enough following that would economically justify placing the meet, match, or game on the air using a conventional television production. These minor-sports are sometimes called "non-revenue" sports, because they do not generate significant income, through ticket sales or through television and radio revenues.  Men's football, men's basketball, and in some regions men's lacrosse and men's bockey, are considered "revenue" sports, at least at the NCAA Division I level. Because of the nature of minor-sport events, and their audience, traditional broadcasting via a commercial network,

---

[2]     Earlier in the claim construction process B2 proposed as a definition of the term "minor-sport" "an originating academic institution's sporting or athletic game, meet, match or competition, or portion thereof, that by itself has a limited or scarce viewership not commanding an audience and which would not justify conventional coverage either live or taped-delayed by local, national or other media organizations." *See* Joint Claim Construction Chart of Disputed Terms (Dkt. No. 33) at p. 2.

such as CBS, ABC, NBC or ESPN, would not make economic sense.  The problem addressed in this patent application is how to make these minor-sports events available to their audience, and how to do this economically and without burdening the originating academic institution.

A "minor-sport event" is a sport, sporting event, or athletic contest of the type that infrequently appears on television, either live or taped-delayed, that is, a sport *not commanding an audience* that would derive a TV rating, nor justifying an advertising campaign to recoup the cost of production and TV air time. Thus when examining their return on investment (ROI), television production costs are prohibitive.  As discussed at the aforesaid interview, commercial television production costs can typically be $1,000 per minute, and so it would be impossible to justify a one-hour production of a college dual wrestling meet or a swim meet, or cross-country meet.  Many examples of minor-sports are listed in the text of the specification. These include what are commonly regarded as non-revenue producing sports, and also would include "club" or non-NCAA sanctioned sports activities (i.e., rugby, figure skating, table tennis, Ultimate Frisbee).  Cheerleading contests and field band contests are other examples.  In order for commercial television to broadcast a sporting event nationally, typically the event needs to command or measure a television viewership in two-hundred-ten (210) local markets; this historically precludes all minor-sports noted above, from any national television audience. There are rare exceptions, which consist of championships, such as the Baseball College World Series, and NCAA women's hockey championships. The regular season games for these teams, or other teams that did not make the playoffs, are not televised.  The "minor-sports" referred to in the specification, at page 1, line 19 to page 2, line 3, are those very sports that do not command sufficient audience to justify an expenditure of many thousands of dollars for television production.  The persons to whom this patent application is directed know exactly what that term "minor-sports" means in this context and which sports

activities would come under that category.  Men's football and
men's basketball are the "conventional" televised college
sports; other athletic activities are not.  It is for the wide video
distribution of such minor-sports activities that this invention is
directed.

Hoehner Decl. (Dkt. No. 28-1) Exh. B, at pp. 10-11 (emphasis in original).

The concern articulated by B2 in opposing LiveSport's proposed

construction of the term minor-sport is that it is unduly nebulous and does

not permit one of ordinary skill in the art to appreciate the dividing line

between major and minor sports.  B2 asserts that its definition would be

far more manageable and would permit those in the industry to know

where the inventor has staked out the boundaries to his '765 patent

claims.  Leaving aside that use of non-revenue producing as a guidepost

could be viewed as injecting as much or greater ambiguity into the

calculus as plaintiff's proposed definition, it raises an argument that is

better addressed in the context of an invalidity analysis rather than on

claim construction.  *See SIBIA Neurosciences, Inc. v. Cadus Pharm.*

*Corp.*, 225 F.3d 1349, 1355 (Fed. Cir. 2000) ("The first step in any

invalidity analysis is claim construction. . . .").  Moreover, while clearly

there is reference to the concept of non-revenue producing sports in the

inventor's response to the PTO office action requesting a further

17

definition, the response refers to minor-sports as "sometimes called non-revenue sports".  Hoehner Decl. (Dkt. No. 28-1) Exh. B, at pp. 10-11 (Emphasis added).  The totality of circumstances, including principally the patent specification, fails to support non-revenue producing as the defining limitation.

Having considered the '765 patent and available excerpts of its prosecution history, I recommend that the term "minor-sport" be construed as "any sporting or athletic game, meet, match, or other competition, or portion thereof, whose average potential viewership is below that which would justify conventional television coverage, either live or tape-delayed, by local, national or other media organizations."

### 2. Self-Help

The next term to be construed is "self-help".   LiveSport urges that the term should be construed as "substantially produced using an originating institution's resources to minimize reliance on professional production equipment or personnel."  Defendant B2 counters that the term should be held to mean "an originating academic institution using said originating academic institution's students or athletic department personnel and equipment in a do-it-yourself fashion and not a professional

production of the type that is carried out by a crew from a commercial television broadcast or cablecast station."

The term "self-help" appears in both the pre-amble to claim one of the '765 patent and in the body of that claim itself, describing a process which includes "obtaining a video production of each said minor-sport athletic events, by self-help, in-house capturing the event at said originating academic institution using at least one video camera and at least one microphone, such that the video productions each include at least one video channel in an audio channel; . . . ." '765 Patent 10:60-64. The specification of the '765 patent makes it clear that the term "self-help" is the functional equivalent of "do it yourself".  *See, e.g.,* '765 Patent, 2:50-53.  During the prosecution of the application leading to the issuance of the '765 patent the inventor noted as follows:

> the intention is that the production be as *self-help* as possible, that is, the production is carried out by any available students or athletic department personnel, and does not require a high-cost, heavily equipment - intensive professional production of the type that is carried out by a crew from a commercial television broadcast or cable cast station.

Hoehner Decl. (Dkt. No. 28-1) Exh. B, at p. 13 (emphasis in original).  In a later response to a PTO office action, the inventor stated that:

> the term "self-help" means that the persons involved in
> the production can be persons without any experience
> in video journalism, and do not need any special
> training to operate the control module, recorder,
> cameras or microphones.  This opens the door for
> members of the team or club to attend to the video
> production entirely on their own. . . the term "do it
> yourself" has a similar meaning, and is used somewhat
> interchangeably [with the term "self-help"].

Hoehner Decl. (Dkt. No. 28-1) Exh. C, at pp. 9-10.

As can be seen, the parties do not materially differ concerning this

claim term.  While defendant's proposed construction is generally

consistent with the patent specification and prosecution history, it would

limit self-help to only those productions solely utilizing the originating

academic institution's students or athletic department personnel and

equipment, a limitation which would exclude parents and other volunteers,

for example, as well as the use of non-institution equipment.  Those

exclusions garner no support from the relevant materials.  Accordingly,

having carefully considered the conflicting proposals regarding this term I

recommend that LiveSport's definition be accepted, with modification to

eliminate superfluous and unnecessary verbiage, and that the term self-

help be construed as "substantially produced using an originating

institution's resources."

20

### 3.  Originating Academic Institution

The phrase "originating academic institution" appears throughout the various claims of the '765 patent.  While the parties have been unable to reach agreement regarding construction of the term, it is only moderately controversial.  LiveSports proposes that the term be construed to mean "any university, college, high school, vocational school, college sports conference or league, high school athletic conference or league, or equivalent conferences or leagues affiliated with a university, college, high school or vocational school for club or non-sanctioned sports."  B2, in turn, offers as a definition "any university, college, high school, college sports conference or league, high school athletic conference or equivalent conferences directly affiliated with a university, college or high school or club or non-sanctioned sports."  As can be seen, the only material difference in the two definitions is that plaintiffs would add vocational schools to the list of potential entities embodied within the term, while B2 proposes that to be covered conferences must be *directly* affiliated with a university, college, or high school.

When pressed at oral argument, counsel for both parties candidly admitted that they cannot point to anything within the patent or patent

prosecution to support their respective additions.  Absent some evidence of an intent on the part of inventor to either expand or limit the term as utilized in the patent, it would be improper for the court to condone such an effort.  *See Vitronics,* 90 F.3d at 1582.

The patentee has not included a definition of the term "originating academic institution" anywhere within the '765 patent.  The patent does, however, provide some guidance concerning the intent of the inventor in coining that phrase.  At one point the patent prosecution offers colleges as an example of originating institutions.  '765 patent 3:28-30.  Elsewhere, when describing the preferred embodiment, the patent contains the following explanation:

> A number of institutions **20**, i.e., universities, colleges, high schools, athletic conferences or athletic leagues provide the video content, that is, institutions generate the video production of the sports or athletic events, and transmit these to the central clearing house **12**.

'765 Patent 6:6-10.

Some insight is also provided concerning the meaning of that term in the prosecution history.  In one communication with the PTO, for example, the patentee stated that:

> [t]he term "orginating institution" has been amended to "originating academic institution" to include colleges and

22

> universities, high schools, college athletic conferences, high
> school athletic conferences, and equivalent conferences for
> the "club" or non-sanctioned sports, as well. . . It is this type of
> organization that constitutes the originating academic
> institutions from which the central clearing house receives the
> video material.

Hoehner Decl. (Dkt. No. 28-1) Exh. B, at p. 11 (internal citations to

specification omitted).

Having scoured the record now before the court, I can find no

support for the inclusion of vocational schools within the definition

associated with originating academic institution, nor can I find, as B2

urges, that a direct affiliation with a conference or league is required.  I

therefore recommend that the term be construed as meaning "any

university, college, high school, college sports conference or league, high

school athletic conference or league, or equivalent conferences or

leagues affiliated with a university, college, or high school for club or non-

sanctioned sports."

4.  Clearing House

Central to the invention taught in the '765 patent is the concept of a

central digital clearing house for use in organizing video productions and

making them available to end viewers.  The parties differ over the

definition to be attributed under the patent to the term "clearing house."

23

LiveSports proposes that it be defined as "a plurality of components that together facilitate the receiving, editing, cataloguing, storing and online viewing of both live and on-demand video productions, and the management of subscriber accounts."  Defendant B2 proposes a more detailed, limited definition, describing the term as:

> a plurality of components that together (a) facilitate the receiving of the video production by transmission thereto from the originating academic institution and of the loading thereof onto a computer system load station for editing, cataloguing, storing, and on-line viewing of both live and on-demand video productions (b) create a subscriber accessible catalogue of video productions stored in a memory arrangement at said clearing house, and (c) facilitate the verification of viewer access authorization, all in a manner that is convenient and inexpensive both to the viewer and the original academic institution.

The function of the clearing house associated with the patented invention is described in both the patent specification and in the claims themselves.  At the clearing house, video and audio recordings of captured events are digitized, if necessary, and electronically stored.  '765 Patent 3:43-54.  Editing can occur at the central clearing house as necessary to "insure[ ] a quality viewing experience while permitting the production personnel at the institution to concentrate only on capturing the event in as simple and straightforward a manner as possible."  *Id.* at 3:63-

66.  The stored materials are catalogued and indexed at the central

clearing house in order to make them available to subscribers.   *Id.*

The patent specification summarizes the function of the designated

clearing house as follows:

> In other words, a central computer facility serves in
> effect as a digital clearing house that is set up to
> receive recorded sports videos and live sports videos.
> The recorded events could include other types of
> events besides sports, such as lectures, college
> commencements, recitals and concerts that the
> institution or owner wants produced.  These video
> productions are stored in the form of digital recordings,
> and can be reproduced and can be edited, if
> necessary.  The facility i.e. clearing house then
> catalogs the events and they are indexed by the
> producer (college, university, etc.) and by the
> classification of the events so that the viewer can
> select a particular game or meet for viewing.  Then
> when the viewer has made his or her selection the
> video material is transmitted via Internet to the viewer.

'765 Patent 4:35-48.  The preferred embodiment set forth in Figure 1 of

the patent confirms these functions of the central clearing house,

depicting if as follows:



FIG.1

'765 Patent Fig. 1.  The written description relating to Figure 1 of the '765

patent notes the following:

> Here, at the heart of the system **10** is a central clearing
> house computer system **12** that receives the sports

26

videos produced by various schools, clubs, or other institutions, and presents the video recordings of these events by webcasting them to subscribers that visit the clearinghouse Internet web site.  The televised sports events are stored on a digital memory arrangement **14** associated with the clearinghouse computer system **12**, and there is also an on-demand webcast facility **16** that obtains the digital recordings of the sports events and transmits them over a wide-band, high speed connection, via the Internet, to authorized subscribers **18** . . . .  These categories are indexed and presented on the clearing house web page, so that the subscriber **18** (or other authorized viewer) can click on the category to select a particular game or meet.  The various subscribers can watch different events at the same time or at different times, or may view the same archive event at different times at their own convenience and choosing.

'765 Patent 5:57-6:39.

Without evidentiary support, defendant's proposed definition seeks to limit the definition of clearing house in two important respects.  First, it specifies the types of equipment to be utilized, including a "computer system load station".  Secondly, the defendant would add the proviso that the central clearing house "facilitate the verification of viewer authorization, all in a manner that is convenient and inexpensive both to the viewer and the original academic institution." Neither of these limitations draws support from either the patent or patent prosecution history, which clearly evince the inventor's intent regarding the function to

27

be served by the clearing house, while leaving open the type of equipment to be utilized in performing those operations.  Accordingly, I recommend adoption of LiveSport's proposed definition, as consistent with the patent language, defining the term as "a plurality of components that together facilitate the receiving, editing, cataloging, storing and on-line viewing of both live and on-demand video productions, and the management of subscriber accounts."

        5.   <u>"Send[ing]" and "Transmit[ting]"</u>

The parties next request the court's construction of the terms "send" and "transmit".[3]

        a.   <u>Send[ing]</u>

The term "send" and its variations appear only in the preamble of independent claim one of the '765 patent which notes, *inter alia*, that each "originating academic institution needs only send in the reported video production to a central clearing house and needs to take no further steps to make the video recordings ready for subscribers for access over a global computer network. . . .".  '765 Patent 10:54-58.

---

      [3]      The parties also initially requested that the court construe the term "submitting". Inasmuch as that word does not appear anywhere in the claims of the '765 patent, however, they now agree that there is no need for construction of that term.

As an initial threshold matter, the court questioned the parties during oral argument as to whether the preamble to that claim is limiting, such as to require construction.  The terms of a patent claim preamble must be construed when they limit the claim which follows.  *Seachange Int'l, Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1376 (Fed. Cir. 2005) (citations omitted).  Addressing such introductory verbiage, the Federal Circuit has observed that

> [i]n general, a preamble limits the invention if it recites a central structure or steps, or if it necessary to give life, meaning, and vitality to the claim.  Conversely, a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purchase for intended use for the invention.

*Catalino Mkg. Int'l, Inc. v. Coolsavings.com, Inc.,* 289 F. 3d 801, 808 (Fed. Cir. 2002) (quotations and citations omitted); *see also On Demand Mach. Corp. v. Ingram, Indus., Inc.,* 442 F.3d 1331, 1343 (Fed. Cir. 2006).  This statement is consistent with the principle that it is the body of a claim, rather than an intended use specified in such introductory language, that controls and provides the critical attributes of patented device or method. *See Catalino, Mktg.,* 289 F.3d 808; *see also Schumer v. Lab. Computers Sys., Inc.,* 308 F.3d 1304, 1310 (Fed. Cir. 2002).

29

In this instance, both parties agree that the preambulatory language at issue sets forth additional limitations beyond those set out in the body of claim one itself, and therefore concur in the belief that it is both appropriate and necessary for the court to construe any disputed terms contained within the preamble, including "send".  As a definition for the term "send", which does not appear to have particular meaning unique to the art in question, LiveSports proposes "to dispatch, as by a communication medium."  B2 differs, and for the terms "send" and "transmit", and variations thereof, would include additional limitations specifying the manner of sending, such as by mail or commercial courier, and would include the additional limitation that the transmission be from an originating academic institution.

It is true, as defendant B2 intimates, that the specification of the '765 patent provides examples as to how recorded video productions may be sent by an originating academic institution to the central clearing house specified in the patent.  *See, e.g.,* '765 Patent 3:41-44 ("This can involve sending a video tape cassette, of any convenient format, by an overnight express courier to the clearing house.").  The patent, however, makes it clear that the originating academic institution can send, or transmit, the

recorded event to the central clearing house either electronically or

physically and does not impose any limitations on the manner of sending.

*See* '765 Patent 3:39-41.  The preferred embodiment disclosed in the '765

patent discusses these alternative methods of transmission of video

recorded events to a central clearing house, stating as follows:

> [e]ach institution **20** has a video production module **22**,
> described later, which it uses to make its video
> productions of events using its own staff, e.g., students
> or members of the athletic department.  Portable, i.e.,
> shipable, video recordings (e.g., VHS cassettes, 8-mm,
> mini-DVD, or other optical disks) of the athletic events,
> i.e., swimming, wrestling, skiing, hockey, figure skating,
> lacrosse, etc., are sent by overnight express courier (or
> uploaded over the Internet) to the central clearing
> house.

'765 Patent 6:16-24.

Of course, it would be improper for the court to construe and to limit

a claim term based upon the preferred embodiment disclosed in a patent,

absent a clear manifest intent on the part of patentee to limit his or her

patent to the preferred embodiment. *Verizon Servs. Corp. v. Vonage*

*Holdings Corp.*, 503 F.3d 1295, 1302-03 (Fed. Cir. 2007) (citing *Phillips*,

415 F.3d at 1323 and *Texas Instruments, Inc. v. U.S. Int'l Trade Comm'n*,

805 F.2d 1558, 1563 (Fed. Cir. 1986)) (parenthetical omitted).

Nonetheless, the court cannot adopt a claim construction so narrow as to

exclude the preferred embodiment. *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1581 (Fed. Cir. 1996) (citation omitted). Even the preferred embodiment in this instance, however, allows for both physical and electronic sending of the sporting event by the originating academic institution to the clearing house.

I also note that while claim one does not on its face limit the mode of transmission of the recorded video production to a central clearing house, claims two and four do narrow claim one in this regard, claim two providing that the captured event is physically transported to the clearing house by "public express service", while claim four involves the sending of an event by video and audio channels in real time. *See* '765 Patent 11:45-51, 57-64. Obviously, the patentee therefore intended independent claim number one to be expansive in terms of the mode of transmission, with claims two and four imposing additional, more specific limitations in that regard.

The term "send" is a common term which does not appear from the '765 patent to have any special meaning to one of ordinary skill in the art when it comes to the subject matter of the patent. Various dictionary definitions of the term "send" include the following: "to cause to go as to

propel in a particular direction"; "dispatch by means of communication"; or

"to convey or cause to be conveyed or transmitted by an agent." MERRIAM-

WEBSTER'S COLLEGIATE DICTIONARY 1065 (10th ed. 1999).  Finding no

basis to adopt B2's more narrow construction, I instead recommend that

the term "send" be given its ordinary meaning, and be construed as "to

dispatch, as by a communication medium".

> ### b.   Transmit[ting]/Transmission

Unlike the concept of sending, which in the '765 patent is focused

upon the conveyance of the recorded event from the originating academic

institution to the clearing house, the act of transmitting in the patent

relates both to that portion of the transaction and the access by the end

user to the events compiled in the central clearing house.  Claim one, for

example, describes the "originating academic institution transmitting said

video productions to the central digital clearing house, . . ." and "a web

transmitter for transmitting the stored video productions of said minor-spot

[sic] athletic events to said subscribers on demand; . . ."  '765 Patent,

10:65-66, 11:5-8.  It is well-established that when a term is contained at

various locations within a single patent, unless the patentee, as

lexographer, clearly denotes an intention to ascribe differing constructions

depending upon usage, that term should be given the same meaning throughout. *Fin Control Sys. Pty, Ltd. v. OAM, Inc.,* 265 F.3d 1311, 1318 (Fed. Cir. 2001) ("we begin with the presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claims.") (citations omitted).

Like the term "send", "transmit" is a generic term that does not appear from the patent to have unique attributes based upon the art in question.  One dictionary defines "transmitting" to include "[t]o send from one person, thing, or place to another; "convey"; "[t]o pass along (information); "communicate"; "electronics [t]o send (a single) as by wire or by radio".  THE AMERICAN HERITAGE COLLEGE DICTIONARY 1834 (4th ed. 2002).  Another authoritative source defines the term "transmit" as "to send or convey from one person to another"; "to send out (a signal) either by radio waves or over a wire line."  MERRIAM- WEBSTER'S COLLEGIATE DICTIONARY 1255 (10th ed 1999).  Obviously, variations of the term "transmit", including "transmitting" and "transmission" have definitions that

are correspondingly generic.[4]

Neither the patent itself nor the patent prosecution history contains indication that further refinement of the term "transmit" from its ordinary meaning was intended by the inventor as used in the '765 patent. Accordingly, I recommend that plaintiff's proposed definition be accepted, and that the court construe the term "transmit" to mean "to send from one person, thing, or place to another; to convey; to pass along (information); communicate; to send (a signal) as by wire or radio", and that the term "transmission" be defined as "the act or process of transmitting."

### 6.  Video Event

The last term requiring construction in this case is "video event". That phrase appears preeminently in the various dependent claims which follow claim one, seemingly as a shorthand means of referring to the events which are the subject of claim one and described in far more detail in that independent claim.  For this term plaintiff proposes as a definition

---

[4]    The terms "send" and "transmit" are often regarded as synonymous, and in this instance appear to have been treated as interchangeable by the patentee. *See, e.g,* ROGET'S TWO, THE NEW THESAURUS 880, 1031 (1988 ed.); *see also Tehrani v. Hamilton Med. Inc.,* 331 F.3d 1355, 1361 (Fed. Cir. 2003) (finding intrinsic evidence indicated patentee meant "indicative of" and "representing" to have the same meaning); *Access Floors, Inc. v. Maxcess Tech., Inc.*, 222 F.3d 958, 968 (Fed. Cir. 2000) (finding "inner layer" and "inner body position," should have the same meaning because they were used interchangeably.")

"the video production of a minor-sport athletic event."  B2, on the other hand, seeks to import further limitations from claim one, proposing as a definition "the video production of minor-sport athletic events produced by an originating academic institution via a self-help, in-house production process described in claim one."

Each of the seventeen claims which follow claim one of the '765 patent are dependent on claim one and relate to the "video events according to claim one".  The various controverted limitations of that independent claim have already been discussed, including "originating academic institutions", "minor-sport" and "self-help".  It would be superfluous to additionally import those concepts into the definition of "video events" when they are clearly already part of claim one and, correspondingly, the following dependent claims.  For the sake of simplicity, I therefore recommend that the court adopt plaintiff's proposed definition of the term "video event" as "the video production of a minor-sport athletic event" as being clearly consistent with what was intended by the patentee.

III.    SUMMARY AND RECOMMENDATION

The patent in suit involves a relatively simple business model

described in terms all of which are readily understandable without

significant need for technical or expert assistance and further refinement.

Having carefully considered the patent in suit, relevant excerpts of the

prosecution history associated with the patent, the arguments of the

parties, and the relevant and available data to inform the court's analysis,

it is hereby respectfully

RECOMMENDED that the court construe the claim terms in dispute

as follows:

| Term | Definition |
|---|---|
| "minor-sport" | any sporting or athletic game, meet, match, or other competition, or portion thereof, whose average potential viewership is below that which would justify conventional television coverage, either live or tape-delayed, by local, national or other media organizations. |
| "self-help" | substantially produced using an originating institution's resources. |
| "originating academic institution | any university, college, high school, college sports conference or league, high school athletic conference or league, or equivalent conferences or leagues affiliated with a university, college, or high school for club or non-sanctioned sports. |
| "clearing house" | a plurality of components that together |

37

| | |
|---|---|
| | facilitate the receiving, editing, cataloging, storing and on-line viewing of both live and on-demand video productions, and the management of subscriber accounts. |
| "send[ing]" | to dispatch, as by a communication medium. |
| "transmit[ting]" | to send from person, thing, or place to another; to convey; to pass along (information); communicate; to send (a signal) as by wire or radio. |
| "video event" | the video production of a minor-sport athletic event. |

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge

written objections to the foregoing report.  Such objections must be filed

with the clerk of the court within FOURTEEN days of service of this report.

 FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE

APPELLATE REVIEW.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P.  6(a), 6(d),

72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

David E. Peebles
U.S. Magistrate Judge

Dated:    September 1, 2011
          Syracuse, NY

39