UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

SPRT, LLC AND LIVESPORTSVIDEO, LLC

Plaintiffs,

v.

B2 NETWORKS, INC., A/K/A B2 TECHNOLOGIES, INC.

Defendant.

Civil Action No. 5:10-cv-809-FJS-DEP

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S OBJECTION TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION AS TO CLAIM CONSTRUCTION

James R. Muldoon (Bar Roll No. 506772)
Ted H. Williams (Bar Roll No. 102830)
HARRIS BEACH PLLC
One Park Place, Fourth Floor
300 South State Street
Syracuse, NY 13202
Telephone:    (315) 423-7100
Facsimile:    (315) 422-9331

*Attorneys for Plaintiffs*
*SPRT, LLC and LiveSportsVideo, LLC*

# TABLE OF CONTENTS

Page

I.   INTRODUCTION ................................................................................................ 1

II.  ARGUMENT ...................................................................................................... 2

    A.  THE COURT SHOULD DISREGARD DEFENDANT'S
    ATTEMPTS TO RAISE NEW EVIDENCE ..............................................................2

    B.  THE REPORT AND RECOMMENDATION CORRECTLY
    CONSTRUED THE DISPUTED TERMS .................................................................3

        1.  THE REPORT PROPERLY CONSTRUED THE CLAIM
        TERM "MINOR SPORTS" .............................................................................4

            a.  The Report's Claim Construction "Minor Sport" Is
            Drawn from Repeated Definitions and Descriptions
            Given to that Term in the Claims, the Specification,
            and the Prosecution History .................................................................4

            b.  Defendant's "Additional Evidence" Shows That
            Applicant Never Disclaimed Non-Revenue Sports .........................7

        2.  THE REPORT PROPERLY CONSTRUED THE CLAIM
        TERM "SELF-HELP" ....................................................................................8

            a.  The Patent Provides Support for the Magistrate
            Judge's Construction ............................................................................9

            b.  Defendant's Reliance on an Unauthenticated
            Dictionary Entry to Narrow the Magistrate Judge's
            Construction is Misguided ............................................................... 10

        3.  THE REPORT PROPERLY CONSTRUED THE CLAIM
        TERM "CLEARING HOUSE" ......................................................................12

            a.  Magistrate Judge Peebles' Construction of
            Construed "Clearing House" Was Supported by the
            Patent and File History ..................................................................... 13

            b.  Magistrate Judge Peebles Properly Omitted a "Load
            Station" Limitation from His Construction of
            "Clearing House" .............................................................................. 14

i

c.    The Report properly construed "clearing house" to include a plurality of components, and excluded any limitations requiring the plurality of components to share a centralized, singular location ........................................... 16

4.    THE REPORT PROPERLY DID NOT APPLY THE "SELF-HELP" LIMITATION TO THE TERM "TRANSMIT" ................................................................................... 19

III.    CONCLUSION ................................................................................................ 23

# TABLE OF AUTHORITIES

Page

**Cases**

*Fuji Photo Film Co., Ltd. v. Int'l Trade Comm.,* 386 F.3d 1106 (Fed. Cir. 2004) ....................... 14

*Home Diagnostics, Inc. v. Lifescan, Inc.,* 381 F.3d 1352 (Fed.Cir. 2004) .............................. 7, 11

*Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.,*
    381 F.3d 1111 (Fed. Cir. 2004)....................................................................................... 7

*Lava Trading, Inc. v. Sonic Trading Mgmt., LLC,* 445 F.3d 1348 (Fed. Cir. 2006).................... 15

*Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898 (Fed. Cir. 2004)........................................ 14

*Linear Tech. Corp. v. Int'l Trade Comm'n,* 566 F.3d 1049 (Fed.Cir. 2009) ........................... 7, 11

*MBO Labs., Inc. v. Becton, Dickinson & Co.,* 474 F.3d 1323 (Fed. Cir. 2007) .................... 15, 22

*Phillips v. AWH Corp.,* 415 F.3d 1303 (Fed. Cir. 2005) ............................................................. 5

*United States v. Blair,* 493 F. Supp. 398 (D. Md. 1980)............................................................. 2

*Vanderlande Industries Nederland BV v. United States Int'l Trade Comm'n,*
    366 F.3d 1311 (Fed. Cir. 2004)...................................................................................... 15

*Virgin Enters., Ltd. v. Virgin Cuts, Inc.,* 149 F. Supp. 2d 220 (D. Va. 2000) ........................... 2, 3

**Statutes**

28 U.S.C. § 636(b)(1) ......................................................................................................... 2, 3

## I.     INTRODUCTION

SPRT, LLC and LiveSportsVideo, LLC (collectively, "LiveSportsVideo") submit this brief in response to Defendant B2 Networks, Inc., a/k/a B2 Technologies, Inc. Objections to Magistrate Judge David E. Peebles September 1, 2011 Report and Recommendation (Docket No. 38; the "Report") regarding the construction of certain disputed claim terms in U.S. Patent No. 7,340,765 ("the '765 Patent").   In its Objections, Defendant advances a number of specious and previously rejected arguments in an attempt to discredit Magistrate Judge Peebles' Report.  None of these arguments, however, articulate a plausible basis for modifying the Magistrate Judge's thorough and well-reasoned claim construction recommendations as to the disputed claim terms.

At the core of Defendant's Objections is a re-hashed attempt to make the same arguments that it made in its original briefing to the Magistrate Judge.  These arguments consist of strained readings of claim language, or improper attempts to read preferred limitations from embodiments of the patent's specification into the claims.  As recognized by Magistrate Judge Peebles, this reasoning is contrary to basic claim construction principles.

Defendant also adds purportedly "new evidence" to buttress its tired arguments.  But the Magistrate Judge's thorough Report indicates that he previously considered the operative parts of the prosecution history in the briefing below.   In any event, courts are discouraged from accepting new evidence and arguments where the Magistrate Judge provides a thorough report and recommendation.  Moreover, a closer analysis of the patent and file history indicates that the Defendant's arguments are without merit, notwithstanding the purported new evidence.

Rejection of Magistrate Judge Peebles' well reasoned claim construction of the terms "minor sport," "self-help," "clearing house," and "transmitting" would therefore be clearly erroneous and violate basic principles of claim construction.  Magistrate Judge Peebles properly construed these claim terms in view of the intrinsic evidence, namely the plain language of the claims, the specification, and the prosecution history.  For the reasons set forth by the Report and

Recommendation and in Plaintiff's briefing[1] on claim construction, the Court should fully adopt the claim construction Report of Magistrate Judge Peebles.

## II.   ARGUMENT

### A.   THE COURT SHOULD DISREGARD DEFENDANT'S ATTEMPTS TO RAISE NEW EVIDENCE

Under 28 U.S.C. § 636(b)(1), the District Court *may and should* disregard any new evidence submitted by Defendant in its Objections. Attempts to raise new evidence and arguments on appeal from a Report and Recommendation are disfavored, especially where the Magistrate Judge held a complete and thorough evidentiary hearing on the issues. *Virgin Enters., Ltd. v. Virgin Cuts, Inc.*, 149 F. Supp. 2d 220, 223 (D. Va. 2000); *United States v. Blair*, 493 F. Supp. 398, 411 (D. Md. 1980) ("In view of the very complete evidentiary hearing held before the Magistrate, it is not necessary for this Court to receive further evidence on the issues presented."). Here, the Magistrate Judge thoroughly examined each of the parties' arguments and evidence, and submitted a detailed Report and Recommendation on the claim construction proposals made by the parties. Even if Defendant had attached the two office actions cited by Defendant in its claim construction brief, but which Defendant failed to submit to the Court in its briefing below, there is no suggestion that these duplicate documents would have altered Magistrate Judge Peebles' opinion. Since the Magistrate Judge considered the operative portions of the prosecution histories presented to him, he would have derived the same conclusions even with the new evidence.[2]

---

[1]      *See* LiveSportsVideo's Opening Brief on Claim Construction (Dkt. No. 28), LiveSportsVideo's Reply Brief on Claim Construction (Dkt. No. 31), and the instant Response Brief to Defendant's Objections.

[2]      In its Objections, Defendant cites to Exhibits 2, 5, 7, and 9 of the Bullock Affidavit. In fact, Exhibits 2 and 9 were included in the original briefing, and cited to by Magistrate Judge Peebles in his Report. Exhibits 5 and 7 make redundant references to a "central clearing house" upon which Defendant relies to support his argument that all components of the clearing house must be in a single location. As briefed *supra* in great detail and discussed in the Report, Magistrate Judge has rejected this argument.

In addition, Defendant proffers no convincing reason for why it failed in the first instance to present all of its evidence and arguments to the Magistrate Judge. Courts frown on attempts to add new evidence under 28 U.S.C. § 636(b)(1), as such last minute attempts cause a waste in judicial resources, impose an unfair advantage and burden on opposing parties, and promote careless preparation of initial papers to a Magistrate Judge. *Virgin Enters., Ltd. v. Virgin Cuts, Inc.* explains that courts should generally decline attempts to add new matter. The entry of new matter permits the piecemeal presentation of evidence and is wasteful on the time of the judges. (*Id.*)  Otherwise, the Magistrate Judge was compelled to write a useless report, and the District Court Judge did not have the benefit of the Magistrate Judge Peebles' view of the entire record. *(Id.)*  Also, the opposing party, in this case, LiveSportsVideo, will be put to the burden of responding to duplicative proceedings. *(Id.)*  In addition, permitting new evidence at such a late stage, enables litigants to withhold evidence in the first instance, and then only use the evidence if they fail to the first time around. (*Id.*)  Finally, the routine consideration of new evidence encourages parties to carelessly prepare their initial papers with the expectation that they may get a second bite at the apple.  Given the strong policy reasons against permitting new evidence, the Court should evaluate the Report based only on the original evidence proffered by the Defendant in its briefing to the Magistrate Judge.

## B.   THE REPORT AND RECOMMENDATION CORRECTLY CONSTRUED THE DISPUTED TERMS

The Report reflects the careful consideration that Magistrate Judge Peebles gave to the parties' respective positions, the claims, the specification, and the prosecution history in arriving at the recommended constructions of the disputed claim terms.  Further, Magistrate Judge Peebles carefully applied Federal Circuit precedent to the facts of this case and correctly construed the disputed claim terms.

## 1.   THE REPORT PROPERLY CONSTRUED THE CLAIM TERM "MINOR SPORTS"

Defendant objects to the construction for the claim term "minor sports" found in claim 1 of the '765 Patent. In the preamble of claim 1, the term appears in pertinent part as follows:

> A self-help process of producing, storing, cataloging, and on-demand web casting of a multitude of ***minor-sport*** athletic events … by self-help video production of a wide variety of ***minor-sport*** athletic events of interest to a wide number of groups of interested persons at each of a plurality of originating academic institutions … wherein such ***minor-sport*** events are characterized by having an associated group of interested persons that is too small to support the cost producing a television broadcast of the event. …

('765 Patent, col. 10, ll. 38-54 (emphasis added).)  Magistrate Judge Peebles correctly construed this term.  Thus, Defendant's arguments to the contrary must be rejected. The relevant constructions for the claim term are shown below:

| Claim Term | The Report's Construction | Defendant's Construction |
|---|---|---|
| Minor Sport | I recommend that the term "minor-sport" be construed as "any sporting or athletic game, meet, match, or other competition, or portion thereof, whose average potential viewership is below that which would justify conventional television coverage, either live or tape-delayed, by local, national or other media organizations. Report, p. 18. | Non-revenue producing sporting events at originating academic institutions. Defendant's Objections, p. 4. |

### a.   The Report's Claim Construction "Minor Sport" Is Drawn from Repeated Definitions and Descriptions Given to that Term in the Claims, the Specification, and the Prosecution History

Defendant objects to the Magistrate Judge's construction of this term because it allegedly failed to incorporate the applicant's attempt to require the total absence of revenue as a hallmark of "minor sports." (Objections, p. 5.)  Contrary to what Defendant suggests, the specification and file history is replete with indications that "minor sports" need *not* be "non-revenue" producing sporting events.  (Report, p. 14.)  Indeed, after carefully considering the patent, specification, and the file history, the Magistrate Judge determined that "[t]he totality of

circumstances, including principally the patent specification, fails to support non-revenue producing as the defining limitation." (Report, pp. 13-18.)

A closer examination of the patent, specification, and file history reveals the same. With great clarity, the Applicant defined "minor sports" during prosecution, stating explicitly that "[a] definition of 'minor sports event' can be found in the specification, e.g., at the paragraph bridging pages 1 and 2. *Minor sports are those which typically do not have a large enough following that would economically justify placing the meet, match, or game on the air using a conventional television production.*" (Hoehner Decl. (Dkt. No. 28-1), Exh. B, p. 10 (*Emphasis added*).)[3]   Ultimately, this is the definition of minor sports that should control. Where "the specification may reveal a special definition given to a claim term by the patentee that differs from the meaning it would otherwise possess, the inventor's lexicography governs." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005).

The applicant restated this definition numerous times during the prosecution of the '765 Patent and its parent application. For example, the October 11, 2007 Amendment includes several pages of discussion repeatedly referring to the definition of "minor sports." The Amendment describes minor sports in terms of the inability to garner sufficient viewership necessary to generate sufficient advertising revenue to cover production costs. (Hoehner Decl., Ex. B, pp. 10-15.) In this Amendment, the Applicant stated, "[a] 'minor sport event' is a sport, sporting event, or athletic contest of the type that infrequently appears on television, either live

---

[3]       The Magistrate Judge's Report stated as follows:

The problem addressed in this patent application is how to make these minor-sports events available to their audience, and how to do this economically and without burdening the originating academic institution. A "minor-sport event" is a sport, sporting event, or athletic contest of the type that infrequently appears on television, either live or taped-delayed, that is, a sport *not commanding an audience* that would derive a TV rating, nor justifying an advertising campaign to recoup the cost of production and TV air time.

(*See* Report, pp. 16-17 (citing to Hoehner Decl. (Dkt. No. 28-1), Exh. B, at pp. 10-11 (emphasis in original)).)

or taped-delayed, that is, a sport not commanding an audience that would derive a TV rating, nor justifying an advertising campaign to recoup the cost of production and TV air time." (*Id.* at 10.)

In addition to this definition, the patent and file history's numerous references to "minor sport" support this clear definition.  The term "minor sport," is repeatedly referred to in the claims and in the specification of the '765 Patent as those sporting events that *are unable to attract enough viewers to warrant the costs and resources of coverage by local or national media organizations*.  ('765 Patent, Hoehner Decl., Exh. A, col. 10, ll. 51-54, col. 12, l. 66 to col. 13, l. 2, col. 1, ll. 35-58 ) (hereinafter "the '765 Patent") According to the patent itself, the critical inquiry is whether the "associated group of interested persons ... is too small to support costs producing [sic] a television broadcast of the event, . . .." *Id.* at col. 10, ll. 51-54).  The inquiry is not whether the athletic event or the average potential viewership generates *any* revenue.  Indeed, at the time of the invention, "video productions of college athletics are limited to major sports only, e.g., football and men's basketball, and then only for a selected ones [sic] of major universities." (Report at 14 (*citing* to '765 Patent at col. 1, ll. 35-50).)  "Because of the high cost associated with producing a sports event for national broadcast, there [was] little interest in producing video broadcasts for small colleges or for so-called minor-sports such as track, wrestling, swimming and diving, tennis or soccer, other than when the game or meet involves a championship." *Id.*

The Magistrate Judge correctly disregarded the Defendant's focus on a single isolated reference during prosecution of the '765 Patent that "minor sports" are *sometimes* referred to as "nonrevenue" sports.  Indeed, Applicant stated during prosecution that "[t]hese minor sports are *sometimes* called 'nonrevenue' sports, because they do not generate *significant income*, through ticket sales or through television and radio revenues." (Hoehner Decl., Exh. B, p. 10 (*Emphasis added*).)  Taking this statement out of context, however, Defendant improperly adopted a construction that implied that "minor sports" cannot *ever* generate *any* revenue.  Such a

construction would be a disingenuous misreading of the patent and its prosecution history. *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1122 (Fed. Cir. 2004) ("the law does not require the court, where an applicant describes only a single embodiment, to construe the claims as limited to that one embodiment...Indeed, such a construction is not encouraged or presumed."). Rather, the discussion in the prosecution history makes clear that the minor sport event does not generate sufficient revenue or "significant income" to recoup the traditional production costs of a television or cable broadcast. (*Id.* at 10.) Defendant conveniently ignored the fact that the same Amendment upon which Defendant relied refers to minor sports as "low-revenue minor sports" and acknowledges that some of the events do include modestly-priced ticket revenue. (*Id.* at 17-18.) Based on the totality of the circumstances, which included all of the foregoing, the Magistrate Judge determined that revenue production should not be a deciding limitation. (Report, pp. 13-18.)

**b.    Defendant's "Additional Evidence" Shows That Applicant Never Disclaimed Non-Revenue Sports**

Only now, after voluminous briefing, and a claim construction order favorable to Plaintiffs does Defendant attempt to introduce "additional evidence" through a April 11, 2005 Amendment to an Office Action. (Objections, p. 4.)[4]  A review of this office action reveals that the applicant never disclaimed revenue generating sporting events. (April 11, 2005 Amendment, Objections, Exh. 2, p. 10.)  *Home Diagnostics, Inc. v. Lifescan, Inc.,* 381 F.3d 1352, 1357 (Fed.Cir. 2004) (A disavowal of subject matter must be made by using clear and unambiguous language of manifest exclusion); *Linear Tech. Corp. v. Int'l Trade Comm'n,* 566 F.3d 1049, 1057-58 (Fed.Cir. 2009). Rather, the applicant stated that the goal of the invention was to enable institutions to generate new forms of revenue streams, otherwise unavailable to smaller institutions. (*Id.*) These forms of revenue might come from subscribers paying a fee to view the

---

[4]    In fact, this Amendment was included as Exhibit 2 to the Hoehner Affidavit (Dkt. No. 28-1), and was in fact cited to by Magistrate Judge Peebles in his Report. (Report (Dkt. No. 38), p. 20.)

archived events, or from the institution providing the video to its alumni as a service. (*Id.*) By permitting reliance on these other forms of revenue, instead of advertising revenue, on which large-scale broadcasters depended, the invention opens up "worldwide exposure to every athletic event." (*Id.*)   ***Nowhere*** in this response is there any mention of non-revenue sports being the focus of the invention.   In fact, the applicant's April 11, 2005 Amendment actually ***supports*** the idea that the goal of the invention was to promote broadcasting of non-major sports, not merely what Defendant calls "non-revenue" sports.   Given the absence of a clear disclaimer of potentially revenue generating sports, the Court must reject Defendant's overreaching "non-revenue" limitation.

### 2.   THE REPORT PROPERLY CONSTRUED THE CLAIM TERM "SELF-HELP"

Defendant objects to the construction for the claim term "self-help" found, i.e., in claim 1 of the '765 Patent.  In the preamble of claim 1, the term appears in pertinent part as follows:

> A **self-help** process of producing, storing, cataloging, and on-demand web casting of a multitude of minor-sport athletic events ... by ***self-help video production*** of a wide variety of minor-sport athletic events of interest to a wide number of groups of interested persons at each of a plurality of originating academic institutions ...

('765 Patent, Col. 10, ll. 38-45 (emphasis added).) Among various locations, the term "self-help" also appears in the first element of claim 1:

> ... obtaining a video production of each of said minor-sport athletic events, by ***self-help, in-house capturing*** the event at said originating academic institution using at least one video camera and at least one microphone, such that the video productions each include at least one video channel and an audio channel; ...

(*Id.,* col. 10, ll. 59-64 (emphasis added).) Magistrate Judge Peebles correctly construed this term and Defendant's arguments to the contrary must be rejected. The relevant constructions for the claim term are shown below:

| Claim Term | The Report's Construction | Defendant's Construction |
|---|---|---|
| Self-Help | "... I recommend that LiveSport's definition be accepted ...and that the term self-help be construed as "substantially produced using an originating institution's resources." Report, p. 20. | An originating academic institution using said originating academic institution's students or athletic department personnel and equipment in a do-it-yourself fashion and not a professional production of the type that is carried out by a crew from a commercial television broadcast or cablecast station. Defendant's Objections, p. 2. |

a.      **The Patent Provides Support for the Magistrate Judge's Construction**

As noted by the Magistrate Judge in his Report, "[t]he term "self-help" appears in both the preamble to claim one of the '765 patent and in the body of that claim itself, describing a process which includes "obtaining a video production of each said minor-sport athletic events, by self-help, in-house capturing the event at said originating academic institution using at least one video camera and at least one microphone, such that the video productions each include at least one video channel in an audio channel . . . ." (Report, p. 19.)

Further reading of the patent and its prosecution history mandates a broad construction of self-help.  An April 11, 2005 Response to an Office Action, relied upon by the Magistrate Judge, provides significant insight into the meaning of "self-help."  In a response to an office action, the inventor stated that the term "self-help" means that the persons involved in the production can be persons without any experience in video journalism, and do not need any special training to operate the control module, recorder, cameras or microphones. This opens the door for members of the team or club to attend to the video production entirely on their own. . . the term "do it yourself" has a similar meaning, and is used somewhat interchangeably [with the term "self-help"]. (Hoehner Decl., Exh. C, pp. 9-10.)

9

This definition makes sense in light of one of the problems that the invention sought to address, namely academic institutions' dependence on television production companies to produce and record video productions of sporting events. In the background of the invention, the specification provides as follows:

> In order to televise an athletic event or other event, the television company either furnishes its own staff to produce the event or hires a subcontracting production company. The event owner, e.g., the college athletic department or the collegiate conference, provides the content, i.e., furnishes the teams and officials. Accordingly, there is not always agreement between the schools and the networks as to what should be included in the telecast or other video production. Also, the requirement for a video production company to furnish its own professionals and production equipment makes the production expensive and rather complex.

('765 Patent, col. 1, l. 60 to col. 2, l. 3.) In light of these problems, an object of the invention was to provide organizations a process for producing and broadcasting videos of sporting events as much as possible by themselves. Given that the invention sought to eliminate or at least reduce academic institutions' dependence on television stations, "self-help" should be construed in a manner to cover forms of production that eliminated that dependence.

### b. Defendant's Reliance on an Unauthenticated Dictionary Entry to Narrow the Magistrate Judge's Construction is Misguided

Defendant argues that the Magistrate Judge improperly construed "self-help" because the construction might include situations where the institution hires a third party to capture the event on its behalf. (Objections, p. 2.) Relying on an unauthenticated dictionary definition from the internet, Defendant raises for the first time the argument that the definition of "resources" (a term used by Report in its construction of (self-help) includes financial resources. According to Defendant, any construction of self-help should exclude the possibility of payment to third parties. Because the Report's construction uses the word "resources," Defendant argues that the Court should narrow the Magistrate Judge's construction.

The claims, specification, and file history, however, support the claim construction given by Magistrate Judge Peebles. The '765 patent's claim describes "obtaining a video production of each said minor-sport athletic events, by self-help, in-house capturing the event at said

10

originating academic institution . . . ." ('765 Patent, col. 10, ll. 60-64.) As noted by the Magistrate Judge, during the prosecution of the application leading to the issuance of the '765 patent, the inventor noted as follows: "the intention is that the production be as *self-help as possible*, that is, the production is carried out by any available students or athletic department personnel, and does not require a high-cost, heavily equipment - intensive professional production of the type that is carried out by a crew from a commercial television broadcast or cable cast station." (Report, p. 19 (*citing* to Hoehner Decl., Exh. B, at p. 13 (emphasis in original)).

Within this context, the Magistrate Judge further refined our understanding of "self-help," by drawing examples of third parties and third party equipment that would be proper, given this broad definition of self-help. He stated that it would be improper to "limit self-help to only those productions solely utilizing the originating academic institution's students or athletic department personnel equipment, a limitation which would exclude parents and other for example, as well as the use of non-institution equipment." (Report, p. 20.) Thus, one skilled in the art could have easily imagined a scenario where the institution pays its students, i.e. in the form of internship monies, to produce the video productions. The key is that the video production is as "self-help *as possible*." Using paid interns would not require the "high-cost" equipment of the type used by a commercial television broadcast or a cable cast station. It would also free the academic institution of any dependence on a television network, one of the key goals of the invention. Further, the employment of paid interns or lower cost third parties with limited video journalism experience would still enable an institution to produce videos for broadcasting to remote viewers, at substantially reduced cost, and without the burdens associated with post-production activities. ('765 Patent, col. 3, ll. 8-21.) The Report therefore properly recognized that the applicant never disavowed or showed any unambiguous intent to limit the claim term "self-help" to exclude such hiring of third parties. *Home Diagnostics, Inc. v. Lifescan, Inc.,* 381 F.3d at 1357; *Linear Tech. Corp. v. Int'l Trade Comm'n,* 566 F.3d at 1057-58.

11

3.    **THE REPORT PROPERLY CONSTRUED THE CLAIM TERM
"CLEARING HOUSE"**

Defendant objects to the construction for the claim term "clearing house" found in claim

1 of the '765 Patent.  In the preamble of claim 1, the term appears in pertinent part as follows:

> A self-help process of producing, storing, cataloging, and on-demand web casting
> of a multitude of minor-sport athletic events, ... support the cost producing a
> television broadcast of the event, and whereby each said originating academic
> institution needs only send in the recorded video production to a central **clearing
> house** and needs to take no further steps to make the video recordings ready for
> subscribers for access over a global computer network, ...

('765 Patent, Claim 1, col. 10, ll. 38-56 (emphasis added).) Among various locations, the term

"clearing house" also appears in the second element of claim 1:

> ... said originating academic institution transmitting said video productions to the
> central digital **clearing house**, the **clearing house** having a computer processor
> for digitally processing each said video production to prepare the video channel
> and audio channel thereof for digital storage and retransmission, a digital memory
> arrangement with capacity sufficient for storing a multiplicity of said video
> productions; ...

(*Id.*, col. 10, ll. 65-118 (emphasis added)) Magistrate Judge Peebles correctly construed this

term and Defendant's arguments to the contrary must be rejected. The relevant constructions for

the claim term are shown below:

| Claim Term | The Report's Construction | Defendant's Construction |
|---|---|---|
| Clearing house | "[A] plurality of components that together facilitate the receiving, editing, cataloging, storing and on-line viewing of both live and on-demand video productions, and the management of subscriber accounts." Report, p. 28. | A plurality of components that together (a) facilitate the receiving of the video production by transmission thereto from the originating academic institution and the loading thereof onto a computer system load station for editing, cataloging, storing and online viewing of both live and on-demand video productions, (b) create a subscriber accessible catalog of video productions stored in a memory arrangement at said clearing house, and (c) facilitate the verification of viewer access authorization, all in a manner that is convenient and inexpensive both to the viewer and the original academic institution. Defendant's Objections, p. 5. |

a.   **Magistrate Judge Peebles' Construction of Construed "Clearing House" Was Supported by the Patent and File History**

As noted by Magistrate Judge Peebles, the function of the clearing house is described at great length throughout the patent.  The clearing house is digital in nature; not only does it receive recorded videos, but it is also where the digitizing of recordings, editing, cataloguing, indexing, and webcasting occurs.  "At the clearing house, video and audio recordings of captured events are digitized, if necessary, and electronically stored." (Report, p. 24 (*citing* to '765 Patent, col., 3, ll. 43-54).)  In addition, editing can occur at the central clearing house as necessary to "insure[ ] a quality viewing experience while permitting the production personnel at the institution to concentrate only on capturing the event in as simple and straightforward a manner as possible." (*Id.* (*citing* to '765 Patent, col. 3, ll. 63-66).) "The stored materials are catalogued and indexed at the central clearing house in order to make them available to subscribers." (*Id.*) In his report, Magistrate Judge Peebles cited to another portion of the patent, which also revealed the digital nature of the clearing house.  The '765 Patent provides as follows:

> [A] central computer facility serves in effect as a digital clearing house that is set up to receive recorded sports videos and live sports videos. The recorded events could include other types of events besides sports, such as lectures, college commencements, recitals and concerts that the institution or owner wants produced. These video productions are stored in the form of digital recordings, and can be reproduced and can be edited, if necessary. The facility i.e. clearing house then catalogs the events and they are indexed by the producer (college, university, etc.) and by the classification of the events so that the viewer can select a particular game or meet for viewing. Then when the viewer has made his or her selection the video material is transmitted via Internet to the viewer.

(*Id.* (*citing* to '765 Patent, col. 4, ll. 35-48).)  Figures 1 and 2 of the '765 Patent also provide graphical embodiments of the plurality of components that together conduct the collection, digitization of recordings, editing, cataloguing, indexing, and webcasting.

**b.      Magistrate Judge Peebles Properly Omitted a "Load Station" Limitation from His Construction of "Clearing House"**

Defendant's attempt to add a "load station" limitation to the construction of "clearing house" amounts to a second bite at an apple gone sour.  As noted by the Magistrate Judge, Defendant included this limitation in its proposed claim construction, but provided no evidentiary support for it.  (Report, p. 27.)  Defendant's noticeable omission of any evidentiary support in the first instance underscores the strained nature of this argument.  Notwithstanding Defendant's failure to submit any evidentiary support, Magistrate Judge Peebles has already rejected the limitation, after considering the '765 Patent and the relevant portions of its patent prosecution history.  Specifically, Magistrate Judge Peebles stated that the limitation does not draw any "support from either the patent or patent prosecution history, which clearly evince the inventor's intent regarding the function to be served by the clearing house, while leaving open the type of equipment to be utilized in performing those operations." (*Id.*, pp. 27-28.)  In a futile attempt, Defendant now cites to the textual reference to "load station" in the patent specification, in making its current argument.  In fact, Defendant already cited to the same language in another portion of its claim construction brief.  (Defendant's Brief on Claim Construction, p. 13.)  There is no indication that Magistrate Judge overlooked the textual reference to "load station" in drafting his Report.  The Court should therefore ignore any attempt by Defendant to now manufacture an argument where none exists.

Even if the Court considers this purported new evidence, Defendant's argument fails for numerous reasons.  Defendant argues that the patent discloses a load station within the patent's specification, and that any claim construction should import it as a limitation.  But as Defendant readily admits in its own Objections, these isolated load station references are *preferred* embodiments. (Objections, p. 6 ("Here, the '765 Patent's specification and preferred embodiment, both, indicate that the central clearing house includes a computer system load station.").)  Reading preferred embodiments into claims, as Defendant attempts to do, is improper. *Liebel-Flarsheim Co. v. Medrad, Inc.,* 358 F.3d 898, 913 (Fed. Cir. 2004); *Fuji Photo Film Co., Ltd. v. Int'l Trade Comm.,* 386 F.3d 1106 (Fed. Cir. 2004).

In addition, Defendant's claim construction would improperly exclude a preferred embodiment disclosed by the patent. *See MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) (rejecting claim construction that would exclude embodiments illustrated in the drawings); *Lava Trading, Inc. v. Sonic Trading Mgmt., LLC*, 445 F.3d 1348, 1353-55 (Fed. Cir. 2006) (rejecting claim construction that "excluded embodiments disclosed in the specification" including embodiments in the drawings); *Vanderlande Industries Nederland BV v. United States Int'l Trade Comm'n*, 366 F.3d 1311, 1320, 1322 (Fed. Cir. 2004) (declining to limit to a specific embodiment where the descriptive text included other embodiments). In fact, the load station is *only one of the preferred embodiments* disclosed in the '765 Patent. ('765 Patent, Fig. 2, col. 5, ll. 50-51 (title to section containing only textual reference to load station is "Detailed Description of the *Preferred* Embodiment.").) Defendant overlooks the fact that the video productions may be transmitted via the Internet either to the load station 44, or to a separate internet server. (*Id.*) In other words, video productions may bypass the load station, rendering the load station irrelevant in some embodiments of the invention. *Id.* It would therefore be improper to import this limitation into the claims as doing so would exclude alternative embodiments disclosed in the specification.

Defendant also makes the conclusory argument that the construction adopted by Magistrate Judge Peebles excludes the preferred claim embodiment including the load station. (Objections, pp. 5-6.) This argument is also unavailing. Defendant fails to demonstrate how the use of a "plurality of components" comprising the Magistrate Judge's construction would exclude the possibility of a load station. As demonstrated by Figure 2, a load station is one of the plurality of components making up the clearing house and which facilitates some of the post-production activities. ('765 Patent, Fig. 2.)

       **c.**       **The Report properly construed "clearing house" to include a plurality of components, and excluded any limitations requiring the plurality of components to share a centralized, singular location**

The Court should also ignore Defendant's haphazard and conclusory attempt to add these "centralized" and "singular" limitations into the claim construction of "clearing house." Specifically, Defendant contends that the Court "should modify the Report's finding and Recommendation to incorporate the applicant's requirement that the plurality of components comprising the "central clearing house" share a centralized, singular location." Defendant's Proposed Claim Construction fails, however, to include any "centralized" or "singular" limitations. (Id. at 5.) Rather, Defendant proposed construction explicitly embraces a plurality of components but contains no reference to a "centralized" or "singular" location. This is in contravention of the November 24, 2010 Court's Pretrial Schedule Order (Dkt. No. 18), which required Defendant to clearly identify its proposed construction. The proposed constructions therefore do not provide LiveSportsVideo with proper notice of Defendant's arguments regarding these limitations. Without the necessary notice, LiveSportsVideo are forced to speculate as to whether Defendant truly wants the construction that it proposes, or whether it would prefer another. And if the latter is true, LiveSportsVideo have no way of discerning what that alternative construction might be. Without knowing which construction Defendant would prefer, LiveSportsVideo cannot provide a full and meaningful reply to this portion of Defendant's opposition.

Notwithstanding Defendant's failure to propose a construction which includes this centralized/singular location, Defendant's reading is inconsistent with the specification and prosecution history. As noted throughout the specification and prosecution history, the "clearing house" is not a descriptor for a single, physical location, so much as it is a process for processing, storing and cataloguing the thousands of self-help athletic events. The athletic events originate from a multitude of originating academic institutions and are then transmitted to a *digital* clearing house which handles all of the post-recording activities. (Report, p. 25 (*citing* to the '765 Patent, col. 4, ll. 35-48) (the "digital clearing house … is set up to receive recorded

sports videos and live sports videos").)  Because digital data may reside within computer networks, the clearing house described by the patent may be comprised of hardware and computer components interconnected by well-known networking channels for digital communication.  Since networking components may inherently be dispersed, the patent clearly contemplated that the digital clearing house would be in more than a single physical location.

Thus, the clearing house is conceptually, but not physically "central" to the production activities of the multitude of academic institutions geographically dispersed throughout the nation; the clearing house provides a common clearing house platform within a digital network(s) for academic institutions.  This does not necessarily mean that the components making up the "clearing house" must all be located in a single room.  Rather, the invention creates a process whereby a single clearing house processes the digital data associated with the videos.  Further, because the clearing house is digital in nature, its location can be in one place or in many places within a computer network – its location or locations are only bounded by the locations in which the data from the originating academic institutions is processed.  (*Id.* at col. 3, ll. 51-54 (the digital data may be many locations as it is "stored at storage location*s* on the associated digital memory arrangement") (emphasis added).)

In addition, the clearing house is composed of various facilities, each of which may be located in a separate physical location.  Those components include, among others, a digitization facility 46, a webcast facility 48, a cataloguing facility, and an accounting and billing facility 52. The patent provides in pertinent part as follows:

> At the central clearinghouse, the video record received from the institution is loaded at a load station 44, and the video and audio content are digitized and the digital video and audio data streams are combined in digitization facility 46. A webcast facility 48 includes a cataloging facility that indexes the televised event to be archived in terms of the date of the event, the school or schools involved (or conference or league, as appropriate), and sport (in this case wrestling). An Internet web server 50 interfaces between the clearinghouse computer system 12

and the Internet, and also is associated with an accounting and billing facility 52,
which may be hardware or software, to identify authorized users and account for
viewing time and which archived (and/or live) webcast events may be viewed by
a particular subscriber or other user.

('765 Patent, col. 7, ll. 19-33. *See also id.*, Fig. 2.)

Magistrate Judge Peebles' citation to the specification supports this paradigm.   In his
Report, he stated that the patent specification describes the patent as follows:

> Here, at the heart of the system 10 is a central clearing house computer system 12
> that receives the sports 26 videos produced by various  schools, clubs, or other
> institutions, and presents the video recordings of these events by webcasting them
> to subscribers that visit the clearing house Internet web site. The televised sports
> events are stored on a digital memory arrangement 14 associated with the clearing
> house computer system 12, and there is also an on-demand webcast facility 16
> that obtains the digital recordings of the sports events and transmits them over a
> wide-band, high speed connection, via the Internet, to authorized subscribers 18 . .
> . . These categories are indexed and presented on the clearing house web page, so
> that the subscriber 18 (or other authorized viewer) can click on the category to
> select a particular game or meet. The various subscribers can watch different
> events at the same time or at different times, or may view the same archive event
> at different times at their own convenience and choosing.

(*Id.*, col. 5, l. 57 to col. 6, l. 39.)  The "clearing house computer system" (not location) central to
the system receives the videos produced by various  schools, clubs, or other institutions, and
presents them through webcasts to subscribers.  It is the digital repository through which the
video recordings flow from the multitude of schools, clubs, and other institutions, to the
subscribers.

The file history also supports the Magistrate Judge's construction.  In pertinent part, the
patentee stated as follows in his October 2007 Response to the July 2007 Office Action:

> [The] thrust of the present invention is that it creates a process of producing, storing, and
> cataloguing thousands of athletic events, ...   In the process of this invention, the
> productions start out as self-help programs, recorded or taped at the school, club or other
> institution.  The clearing house takes the self-help video productions from all these
> schools and clubs and for all these various sports, and makes them ready for on-demand
> viewing . ...   The clearing house is entirely responsible for editing and adapting the
> recording of the event for viewing via Internet, and for all quality control aspects of the
> presentation on the Internet. The college, university, or school athletic conference does
> not bear any burden of post-production processing, editing, or web hosting.

(Hoehner Decl. (Dkt. No. 28-1), Exh. B, p. 12.)  This description in no way describes the clearing house located at a single physical location.  Rather, the clearing house is a reference to the system and process that centralizes all of the post-production activities.  Because the clearing house assumes the responsibilities for all of these post-production activities, the schools and students need not burden themselves with the costs and work associated with editing and webcasting.  Those burdens therefore become centralized within the clearing house.

Defendant's citations to various appearances of the word "central" in the patent's specification also provide no basis for adding the "singular" limitation.  First, Defendant cites to a October 11, 2007 Office Action, which allegedly emphasizes the "singular" nature of the clearing house.  (Objections, p. 6.)  In fact, there are no references of these descriptors anywhere on page 15 of the Office Action.  (*Id.*, Exh. 9, p. 15.)  Defendant provides additional citations to instances where the word "central" appears, (*See* Objections, p. 6, fn. 4-5.), but with the exception of the citation to the October 11, 2007 Response to an Office Action, each of these citations were in Defendant's Brief on Claim Construction.    (Defendant's Brief on Claim Construction (Dkt. No. 30), p. 14, fn. 11-12.)  Magistrate Judge Peebles considered each of these citations, as well as each instance in which the word "central" appears throughout the entirety of the patent and the patent prosecution file.  After careful review and deliberation, he rejected the idea that all of the components of the central clearing house need to be in a single location.  Further, and as described above, Defendant incorrectly interprets "central" to describe a physical location.  In fact, the term "central" throughout the specification and file history refers to the centralized nature of the post-production data processing, storage, editing, and webcasting.

### 4.    THE REPORT PROPERLY DID NOT APPLY THE "SELF-HELP" LIMITATION TO THE TERM "TRANSMIT"

Once again, the Court should ignore Defendant's overreaching attempt to import the self-help limitation from claim 1's preamble into the term "transmitting", (See Objections, p. 7.),

which appears in, among various elements, the second element of claim 1. Specifically,

Defendant contends that the applicant used the "self-help" limitation within claim 1's preamble,

and that all acts therefore committed by the originating academic institution should be by self-

help. By way of background, the preamble provides in pertinent part as follows:

> A **self-help** process of producing, storing, cataloging, and on-demand web casting
> of a multitude of minor-sport athletic events, each of which has a limited
> viewership but which in aggregate result in a significant volume of viewers, by
> **self-help** video production of a wide variety of minor-sport athletic events of
> interest to a wide number of groups of interested persons at each of a plurality of
> originating academic institutions, and of recording or storing, and processing and
> **transmitting** on demand the video recorded events to as wide as possible a field
> of subscribers ...

('765 Patent, Preamble, col. 10, ll. 38-57 (emphasis added).) Transmitting appears in various

elements, including these elements of claim 1:

> said originating academic institution **transmitting** said video productions to the
> central digital clearing house, the clearing house having a computer processor for
> digitally processing each said video production to prepare the video channel and
> audio channel thereof for digital storage and retransmission, a digital memory
> arrangement with capacity sufficient for storing a multiplicity of said video
> productions; [second element]
> ...
> and a web transmitter for **transmitting** the stored video productions of said
> minor-spot athletic events to said subscribers on demand; [fourth element]

(*Id.*, Claim 1, col. 10, l. 38 to col. 11, l. 44.) Defendant argues that the Court should impose the

"self-help" restriction from the preamble to the "transmitting" that occurs in the second element,

since it is the academic institution conducting the "transmitting." Magistrate Judge Peebles

correctly construed this term and Defendant's arguments to the contrary must be rejected. The

relevant constructions for the claim term are shown below:

| Claim Term | The Report's Construction | Defendant's Construction |
|---|---|---|
| Transmit | "I recommend that plaintiff's proposed definition be accepted, and that the court construe the term "transmit" to mean "to send from one person, thing, or place to another; to convey; to pass along (information); communicate; to send (a signal) as by wire or radio", and that the term "transmission" be defined as "the act or process of transmitting." Report, p. 35. | None provided. *See* Defendant's Objections, p. 7. |

As an initial matter, and as was the case with Defendant's attempt to add a "singular" limitation to the term "clearing house," Defendant's fails to propose a claim construction for the "transmitting" element in its Objections.   Defendant therefore deprived LiveSportsVideo of proper notice of Defendant's argument. (Objections, p. 7.)  In addition, Defendant provides no additional support for its argument in its Objections; Defendant merely references its Claim Construction Brief in attempting to impose the self-help limitation on "transmitting.   Thus, Defendant presents nothing new that Magistrate Judge has not already considered and rejected.

As discussed in LiveSportsVideo's original claim construction briefing and in the Magistrate Judge's Report, nothing in the specification or prosecution history of the '765 Patent imparts any special meaning to the term "transmitting". (Report, pp. 34-35.)  Rather, the terms are used according to their ordinary and customary meaning, as supported by various dictionary definitions.  For example, the term "transmit" is defined by *The American Heritage College Dictionary* (4th ed. 2002) ("American Heritage") as "[t]o send from one person, thing, or place to another; convey"; "[t]o pass along (information); communicate"; "[e]*lectronics* [t]o send (a signal) as by wire or radio," and by the *Merriam-Webster Unabridged* dictionary (available at http://unabridged.merriam-webster.com/) ("Merriam-Webster") as "to cause to go or be conveyed to another person or place"; "to send out a signal either by radio waves or over a wire line." (Hoehner Decl., Ex. E.)  The term "transmission" is defined by American Heritage as [t]he act or process of transmitting," and by Merriam-Webster as "an act, process, or instance of transmitting." (Hoehner Decl., Ex. F.)  Accordingly, variations of the term "transmit," including "transmission" and "transmitting" should have definitions that are correspondingly generic.

Defendant's attempt to apply the term "self-help" to transmitting is misleading.  The preamble uses the term "self-help" three times: "self-help process of producing, storing, cataloging, and on-demand web casting of a multitude of minor-sport athletic events, ... , by self-help video production of a wide variety of minor-sport athletic events of interest ... obtaining a video production of each of said minor-sport athletic events, by self-help, in-house

capturing the event at said originating academic institution . ....." ('765 Patent, Preamble, col. 10, ll. 38-58.) Essentially, the patent discloses a self-help process for producing, storing, cataloging, and on-demand web casting. But this does not mean that each step of this process is executed by self-help means. Rather, the preamble clearly uses the self-help limitation only with respect to the description of "video production." The preamble does not describe the transmitting component of the process as a self-help measure.

Applying "self-help" to transmitting also would exclude preferred embodiments of the invention. For example, the patent expressly discloses transmitting a recording of a minor sports event to the clearinghouse by overnight delivery service. '765 patent Col. 3, ll. 41-44. In this embodiment, it is indisputably a third party, e.g. Federal Express, UPS or U.S. Postal Services, who is delivering the tape or disk. Therefore, Defendant's proposed construction would violate the claim principle that proper claim constructions should not exclude preferred embodiments disclosed in the specification. *MBO Labs., Inc. v. Becton, Dickinson & Co., supra,* 474 F.3d at 1333.

Additional language in claim 1 supports the conclusion that "self-help" only applies to the video production. The first element of claim 1 clearly provides for "obtaining a video production of each of said minor-sport athletic events, by self-help in-house capturing the event at said originating academic institution using at least one video camera and at least one microphone, such that the video productions each include at least one video channel and an audio channel". In contrast, the second element ***does not include*** the self-help limitation: "said originating academic institution transmitting said video productions to the central digital clearing house . ...." Had the applicant sought to add a self-help limitation to "transmitting," it would have done so. Thus, Defendant attempts to improperly add a limitation that directly contradicts the claim language of the '765 Patent. This also renders unavailing Defendant's implication that not adding the self-help limitation to "transmitting" would result in the using different meanings for the same claim terms throughout the patent. (Objections, p. 7.) Since there is no self-help

limitation on "transmitting," it would be inconsistent to add that limitation to an element that does not contain such a limitation.

## III.   CONCLUSION

Based upon the foregoing and the arguments set forth in substantial detail in Plaintiffs Claim Construction briefing below, LiveSportsVideo respectfully request adoption of the Report's construction of the claim terms "minor sport," "self-help," "clearing house," and "transmitting" without modification.

Date:   September 30, 2011        */s/ James R. Muldoon*
        Syracuse, New York        James R. Muldoon (Bar Roll No. 506772)
                                  Ted H. Williams (Bar Roll No. 102830)
                                  HARRIS BEACH PLLC
                                  One Park Place, Fourth Floor
                                  300 South State Street
                                  Syracuse, NY 13202
                                  Telephone:    (315) 423-7100
                                  Facsimile:    (315) 422-9331

                                  *Attorneys for Plaintiffs SPRT, LLC and*
                                  *LiveSportsVideo, LLC*